ACCEPTED
02-15-00113-CR
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
9/14/2015 8:10:40 AM
DEBRA SPISAK
CLERK

## NO. 02-15-00113-CR

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
9/14/2015 8:10:40 AM
DEBRA SPISAK
Clerk

## COURT OF APPEALS
## FOR THE SECOND DISTRICT OF TEXAS

## ZACHARY R. ROBINSON

## V.

## STATE OF TEXAS

## ON APPEAL FROM COUNTY CRIMINAL COURT NO. 1, DENTON COUNTY, TEXAS
## THE HONORABLE JIM E. CROUCH PRESIDING

## BRIEF OF APPELLANT

**SUBMITTED BY:**

**Seth Kretzer**
**Law Offices of Seth Kretzer**
**440 Louisiana Street; Suite 200**
**Houston, TX 77002**
**Bar Number: 24043764**

**Oral Argument Requested**

# IDENTITY OF PARTIES AND COUNSEL

*Appellent/Defendant:*

Zachary R. Robinson

*Counsel for Appellant:*

Seth Kretzer
Law Offices of Seth Kretzer
440 Louisiana Street; Suite 200
Houston, TX 77002
713-775-3050 (Direct)
seth@kretzerfirm.com (email)

*Appellee/Plaintiff:*

The State of Texas

*Counsel for Appellee:*

Catherine Luft
Assistant Criminal District Attorney
1450 East McKinney
Denton, TX 76209

# **TABLE OF CONTENTS**

*Page*

IDENTITIES OF PARTIES AND COUNSEL…………….…..……………...…..i

INDEX OF AUTHORITIES…..………….…..……………………….…..iii

RECORD REFERENCES……….…...……………..…..……………………....…iv

STATEMENT OF THE CASE……………………...…..………………..……v

ISSUES PRESENTED…………………………………………...……...v

STATEMENT OF FACTS…………………………...…..…………….....…...1

SUMMARY OF ARGUMENT……………………...…..……………...…….9

ARGUMENT………………………………………...…..…….9

    A. Elements of Interference with an Emergency Call……………...…….9

    B. Ms. Kimberling Did Not Reasonably Believe That She Was In
       Fear of Imminent Assault…………………………………...……..10

    C. Mr. Robinson Did Not Know That He Was Preventing or Interfering
       With An Emergency Call……………………………….………...13

PRAYER……………………………………………………………14

CERTIFICATE OF COMPLIANCE……………………...……………15

CERTIFICATE OF SERVICE…………………………………...………..15

APPENDIX

# INDEX OF AUTHORITIES

*Page*

***Federal Case***

*Jackson v. Virginia*, 443 U.S. 307 (1979)……………………………………….…8

***State Cases***

*Louis v. State*, 393 S.W.3d 246 (Tex.Crim.App.2012)……………….…………….8

*Matlock v. State*, No. 12–05–00413–CR, 2006 WL 2106951
(Tex.App. July 31, 2006)……………………………………………........10,11,13

***Statutes***

Tex. Pen. Code § 1.07…………………………………………….…....10,11

Tex. Pen. Code § 22.01……………………………………………….………11

Tex. Pen. Code § 42.062…………………………………………….....9,10,11

# **<u>RECORD REFERENCES</u>**

The Record citing convention contained below is used throughout Appellant's Brief.

CR Vol. 1 p. ___    Clerk's Record Volume 1, page ___

CR Vol. 2, p. ___    Clerk's Record Volume 2, page ___

CR Vol. 3, p. ___    Clerk's Record Volume 3, page ___

## STATEMENT OF THE CASE

Zachary Robinson was charged with Assault Family Violence and Interference with an Emergency Call. CR Vol. 2, p. 5-6. The jury returned a unanimous verdict of not guilty of the charge of assault but guilty of the charge of interference. *See* Robinson Judgment. This appeal challenges the legal sufficiency of the jury's finding with regard to the interference charge.

## ISSUES PRESENTED

1. Whether a rational trier of fact could have found beyond a reasonable doubt that Ms. Kimberling reasonably believed herself to be in fear of imminent assault.

2. Whether a rational trier of fact could have found beyond a reasonable doubt that Mr. Robinson knowingly prevented Ms. Kimberling from making a phone call, or interfered with her ability to make a phone call.

## STATEMENT OF FACTS

### A. Introduction

This case involves a he-said/she-said dispute of facts with very little third-party or objective evidence. Because this Court reviews sufficiency challenges in the light most favorable to the State's theory of inculpation, the following statement of facts is based almost entirely on Ms. Kimberling's sworn version of events.

### B. Ms. Kimberling's Version of Events

On the night of September 8, 2014, Mr. Robinson was an invited guest of Rachel Kimberling at her house in Denton, Texas. They had dinner, watched a movie, and went to bed together. CR. Vol. 2, p. 61. In bed, they argued, Mr. Robinson touched Ms. Kimberling, she asked him to leave, and he got up and walked to the front room of the house. CR Vol. 2, p. 62. Ms. Kimberling explained:

> Q.     Let's get the sequence down. You're in bed. You're arguing. He then grabs your arm and squeezes you tight. He then gets up on his own accord to leave, and then you followed him down the hallway . . .
> A.     Yes.

CR Vol. 2, p. 86.

Ms. Kimberling admitted several times at trial that she told Mr. Robinson that she was going to call 911 not because she was in fear of an assault, but out of

1

spite simply because she wanted him to leave. For example, Mr. Kimberling

testified on direct examination:

> Q.   Okay. So you follow him out into the hallway. What happened next?
>
> A.   I just remember he was walking in front of me and we were walking the same direction and we're yelling at each other, and I just remember him kind of like backing into me, like pushing me back. And I got upset, and we kept arguing, and I asked him to leave. And I told him that if he didn't leave, I was going to call the cops.
>
> Q.   Okay. And once you told him you were going to call the police, what happened at that point?
>
> A.   He took my [white Iphone 5C].
>
> Q.   And where was your phone when he took it?
> A.   Out of my hand.
>
> Q.   Now, once he took your phone, what happened next?
>
> A.   He went back into the master bedroom, and I followed him back there to try to get it back. And I was trying to fight to get into the bedroom. He was trying to fight to keep me out, and he smashed my hand in the door several times.

CR Vol. 2, P. 62-63.

> On subsequent cross examination, she testified:
>
> A.   Yeah. When we're fighting and I would have to threaten to call the cops before, yes, I would.
>
> Q.   You threatened to call the cops before?
>
> A.   Yes, I have.
>
> Q.   And did you tell the cops when they responded to this incident about all these other times?

A.      I told them that I had threatened him before, that I had threatened to call the cops before, or his mother, and I've called his mother before.

. . .

Q.      So he's now taking your phone.  Did you say, no, that's not – don't take it; it's my phone?

A.      Yeah.  Anytime that's happened, yes.

Q.      And why did you, as you're chasing Mr. Mr. Robinson out of the house, why did you grab your phone to do so?

A.      Like I said, anytime that we have fought in --in the past couple times, I've had to threaten to call the cops to get him to leave, and so I had it with me.

Q.      So from the walk to (sic) the bedroom to the hallway, you didn't dial 911 at that point?

A.      No.

Q.      You were still –

A.      We had just started arguing.

Q.      It was just still a threat?

A.      And, yeah, it was a threat.  It's always just been a threat to leave.  It wasn't my intention to actually have to need to call the cops, but it was a way to get him to leave.

Q.      And then what happens?  Does he get your phone out of your hand?

A.      Uh-huh.

Q.      What happens then?

A.      He ran back to the bedroom, and I followed him.  And he tried to shut the door, and I was trying to get in through the door.

Q.     So you followed him, now, back to the bedroom, and you were trying -- he wouldn't let you inside the bedroom door?

A.     Correct.

Q.     And so you fought to get inside the bedroom door?

A.     Correct.

Q.     Wouldn't you agree with me that your pattern of -- of activity at this point is just you chasing him around the house?

A.     To get my phone.

Q.     I mean, why would -- why is this phone so important?  Why can't you just let him have it and get it later?

A.     First off, he's in my house, and second of all, I wanted to call the cops to get him to leave.

In sum, Ms. Kimberling's testimony confirms that she was not in fear of Mr. Robinson, but, rather, was using the threat of calling the police in order to get him out of her house.  As she testified, this was a regular pattern of behavior in their typical arguments.

With regard to the remainder of their fight, Ms. Kimberling's version is summarized as follows: after fighting to get into the bedroom where Mr. Robison was hiding, and in the process having her hand slammed in the doorway, Ms. Kimberling then followed Mr. Robinson into the foyer area where she tripped over an ottoman that he had pushed into her way, and then followed Mr. Robinson back to the bedroom, where she struggled to get through the door and her foot was

4

slammed in the doorway. Ms. Kimberling then explained that she was locked in the bedroom closet, and, uncertain of how she got out of the closet, then kicked through and shattered the bedroom window, after which Mr. Robinson put her on the bed and covered her with blankets. CR Vol. 3, p. 12-13. She says that Mr. Robinson then lost interest in her, and she walked to her neighbor's house, at which point the 911 call was made. CR Vol. 2, p. 68-69.

### C. Mr. Robinson's Version of Events

Mr. Robinson's version of events is not all that different from Ms. Kimberling's, with two important exceptions. First, while Ms. Kimberling claims that Mr. Robinson was acting aggressively, he explains that he was merely trying to get away from her, and that any injuries suffered by Ms. Kimberling were the result of his efforts to get away from her (e.g., pushing an ottoman behind him into her way, causing the "hysterical" Ms. Kimberling to trip; closing the doors behind him so that she could not get to him, but accidentally catching her hand or foot in the doorway) and de-escalate their argument. *See* CR Vol. 3, p. 166-70. And, second, he claims that he grabbed Ms. Kimberling's phone (a white IPhone 5C) by mistake from a nightstand in the bedroom as he was gathering his belongings in his attempt to leave the house, and did not intentionally take her phone from her hand. CR Vol. 3, p. 164, 182. He testified that, unaware of the fact that he had left his phone in Ms. Kimberling's car, he believed that the phone he grabbed as he was

5

trying to leave the house was his phone (a white IPhone 5S), because their phones are very similar.  CR Vol. 3, p. 174.

Mr. Robinson's account was substantiated in at least two significant areas. First, Ms. Kimberling confirmed that Mr. Robinson had unknowingly left his phone in her car.

> Q.	And later on, after this had all transpired, after you had talked to police, did you actually find the defendant's phone somewhere?
>
> A.	Yes.
>
> Q.	And where was that?
>
> A.	Me and the officer found it in my car on the passenger side.
>
> Q.	And do you know how it had gotten there?
>
> A.	I assume that it fell out of his pocket on our ride to dinner.

CR Vol. 2, p. 74.  And, second, Officer Hooton, one of the police officers who responded to the 911 call, testified that Mr. Robison's behavior was defensive, in other words not something of which to be fearful:

> Q.	You referred several times to a term similar to or including a "defensive manner," that Mr. Robinson was acting basically in a defensive manner.
>
> A.	Uh-huh.
>
> Q.	And sometimes you would include a word like "retreat" and use those as synonyms.  Is that fair to say?
>
> A.	Yes.

6

Q.  So my question is, by using the term "defensive manner," you mean that he was retreating from the situation and removing himself from the situation.  Is that accurate?

A.  Yes.

CR Vol. 3, p. 84-85.

## D. The Emergency Call

Ms. Kimberling eventually did decide to leave her house to use her neighbor's phone to call the police.  Mr. Robinson did not prevent her from doing so; in fact, he gathered his things and got into his truck to leave.  She explained it this way:

> I was able to actually -- he wasn't paying attention to me anymore. I really think it was over, and he was trying to get his stuff, and I went out front and my neighbor was out front. I asked him to call the police.

CR Vol. 2, p. 68-69.  The neighbor, Josh Johnson, testified about seeing Ms. Kimberling and then Mr. Robinson as follows:

A.  [Ms. Kimberling] was like, please call 911, my boyfriend has gone crazy.

Q.  Okay.  So did -- did you end up calling 911?

A.  I did.
…
Q.  And when they were exchanging words, Rachel was in your front yard, or porch?

A.  Yeah, she's pretty much on the front porch, if-- if you want to call it a front porch.  There's a --kind of an extended concrete pad that runs the majority of the width of the house.

Q.  And Mr. Robinson was in the driveway?  Where was he?

A. There's not a driveway in the front of the house. He's -- he's on the curb.

Q. Near his truck?
A. He's in his truck, in the driver's seat.

Q. Okay. And then Ms. Kimberling . . . asks him, begs him, not to leave?

A. She's saying, you need to stop, please get out of the truck. Now, there were more things said. I don't know what was said, but that -- that is stuck in my mind.

CR Vol. 2, p. 40. This testimony shows that Ms. Kimberling was able to make an emergency call. It further shows that Ms. Kimberling, who asked Mr. Robinson to get out of his truck, was not scared of him.

## STANDARD OF REVIEW

In assessing the legal sufficiency of the evidence to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Louis v. State*, 393 S.W.3d 246, 249 (Tex.Crim.App.2012) (internal citations omitted).

## SUMMARY OF ARGUMENT

No rational trier of fact could have found Mr. Robinson guilty of interference with an emergency call because the elements of that charge were not proven in this case.  Tex. Pen. Code § 42.062(a).  Specifically, there was no emergency, and there was no record evidence that Mr. Robinson knew or had reason to know that he was preventing Ms. Kimberling from making an emergency call.  Because the elements of the charge were clearly not satisfied, no rational trier of fact could have found Mr. Robinson guilty and, as a result, the conviction must be overturned.

## ARGUMENT

### A. Elements of Interference with an Emergency Call

Interference with an emergency phone call is proscribed by Section 42.062(a) of the Texas Penal Code, which reads as follows:

> (a) An individual commits an offense if the individual knowingly prevents or interferes with another individual's ability to place an emergency telephone call or to request assistance in an emergency from a law enforcement agency, medical facility, or other agency or entity the primary purpose of which is to provide for the safety of individuals.

Tex. Pen. Code § 42.062(a). As the trial court stated, a person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.  CR Vol. 3, p. 209.  "Emergency" is defined as

9

(d) [A] condition or circumstance in which any individual is or is reasonably believed by the individual making a telephone call to be in fear of imminent assault or in which property is or is reasonably believed by the individual making the telephone call to be in imminent danger of damage or destruction.

*Id*. § 42.062(d). And finally, a reasonable belief is "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id*. § 1.07(a)(42). Thus, in order to find Mr. Robinson guilty of this offense, the jury must find the following:

1) Ms. Kimberling reasonably believed she was in fear of imminent assault;
2) Ms. Kimberling's phone call was knowingly prevented or interfered with.

Here, the State did not prove these elements because the record does not show that Ms. Kimberling reasonably believed she was in fear of imminent assault, that Mr. Robinson had reason to know that Ms. Kimberling even could have been in fear of imminent assault, or that Ms. Kimberling's ability to make a phone call was prevented or interfered with.

### B. Ms. Kimberling Did Not Reasonably Believe That She Was In Fear Of Imminent Assault.

Even if one believes Ms. Kimberling's unsupported testimony that Mr. Robinson was attacking her, one cannot also believe that Ms. Kimberling was actually trying to make an emergency call. This case is very similar to *Matlock v. State*, No. 12–05–00413–CR, 2006 WL 2106951, at *2 (Tex.App.-Tyler July 31, 2006, no pet.) (mem. op., not designated for publication), where the Tyler Court of

Appeals considered whether there was legally sufficient evidence that an interrupted call to 911 constituted an emergency call for purposes of Section 42.062(d). In that case, the defendant, who had entered living room of wife's apartment through a window, grabbed phone from wife's hand after the 911 operator answered, and he pushed his wife away as she tried to reach for the phone. Yet, the record contained no evidence that the wife, when she made the 911 call, was afraid of her husband, or that she reasonably feared that she was in danger of imminent assault. Tex. Pen. Code §§ 1.07(a)(42), 22.01(a), 42.062(a). Because there was no proof of facts of circumstances from which one could infer that the wife reasonably feared he would assault her, and no evidence that he had threatened her, the court overturned the husband's conviction. *Matlock*, at \*2-3.

While Ms. Kimberling may have stated that she was scared of Mr. Robinson, the record does not support that statement. Ms. Kimberling invited Mr. Robinson to her house, she invited him to go to dinner with her, and she invited him to return to her house and sleep with her. CR. Vol. 2, p. 61. After their argument began, Mr. Robinson walked to the front of the house to leave. Instead of letting him go—which a fearful person unquestionably would have done—she testified that she followed him. CR. Vol. 2, p. 62. She admits that when he left the front room to get away from her, instead of walking directly out of the house and to her neighbors, she followed him toward the bedroom, where he was trying to hide.

11

("He went back into the master bedroom, and I followed him back there . . . And I was trying to fight to get into the bedroom." CR Vol. 2, p. 62-63.)  Furthermore, it would not be reasonable to infer that she was trying to make an emergency call because, as she testified, she repeatedly in the past had threatened to call the police during their arguments, but they were only threats to get Mr. Robinson to leave— not to report an emergency:

> A.     Like I said, anytime that we have fought in --in the past couple times, I've had to threaten to call the cops to get him to leave, and so I had it with me.
>
> Q.     So from the walk to (sic) the bedroom to the hallway, you didn't dial 911 at that point?
>
> A.     No.
>        . . .
> Q.     It was just still a threat?
>
> A.     And, yeah, it was a threat.  It's always just been a threat to leave.  It wasn't my intention to actually have to need to call the cops, but it was a way to get him to leave.

CR Vol. 2, p. 62-63.  Based on Ms. Kimberling's own testimony, one must conclude that she did not actually believe there was an emergency.  Furthermore, based on the testimony of the neutral neighbor, there is no basis to infer that Ms. Kimberling was afraid:

> Q.     Okay.  And then Ms. Kimberling . . . asks him, begs him, not to leave?
>
> A.     She's saying, you need to stop, please get out of the truck.  Now, there were more things said.  I don't know what was said, but that -- that is stuck in my mind.

CR Vol. 2, p. 40.

The *Matlock* court sustained the appellant husband's sufficiency challenge because there was no record evidence that the complainant wife was afraid of the appellant or upon which one could infer that she reasonably feared he would assault her. *Matlock*, at \*2–3. In the case *sub judice*, the evidence militates even more strongly in Mr. Robison's favor: Ms. Kimberling's own testimony and the testimony of a neutral non-party establishes an undisputable lack of emergency. The conviction of interference with an emergency call fails the legal sufficiency test and must be overturned.

### C. <u>Mr. Robinson Did Not Know That He Was Preventing or Interfering With An Emergency Call.</u>

Not only was there no record evidence on which the trier of fact could infer that Ms. Kimberling was trying to make an emergency call, there is no evidence that Mr. Robinson had reason to know that he was preventing or interfering with Ms. Kimberling's ability to make a phone call, let alone an emergency phone call. This is because, for the same reasons that the trier of fact could not infer that Ms. Kimberling was fearful, Mr. Robinson could not infer that Ms. Kimberling was fearful. As stated above, Ms. Kimberling had made similar threats regarding emergency calls in the past, and those threats were based on her desire to get him out of the house, not her fear of him.

It is also because, as Officer Hooton attests, Mr. Robinson was acting defensively while Ms. Kimberling was chasing him around.

> Q.    So my question is, by using the term "defensive manner," you mean that he was retreating from the situation and removing himself from the situation. Is that accurate?
>
> A.    Yes.

CR Vol. 3, p. 84-85. It is hard to imagine any circumstance wherein the "chaser" would reasonably fear the "chasee."

Finally, Mr. Robinson could not have known that he was preventing or interfering with an emergency call because there was no actual prevention or interference. Once Ms. Kimberling regained calm and levelheadedness, she was able to simply walk out of the house and ask her neighbor to make a call. Ms. Kimberling explained it this way:

> I was able to actually -- he wasn't paying attention to me anymore. I really think it was over, and he was trying to get his stuff, and I went out front and my neighbor was out front. I asked him to call the police.

CR Vol. 2, p. 68-69.

## **PRAYER**

For the foregoing reasons, the jury's finding with respect to the charge of Interference with an Emergency Call is legally insufficient, and Mr. Robinson respectfully requests that this Court reverse and render.

14

Respectfully submitted,

_____
Seth Kretzer
Law Offices of Seth Kretzer
440 Louisiana Street; Suite 200
The Lyric Center
Houston, TX 77002
(713) 775-3050 (Direct)
seth@kretzerfirm.com (email)

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this brief contains 3,364 words (excluding the caption, table of contents, table of authorities, signature, proof of service, certification, and certificate of compliance). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

_____
Seth Kretzer

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this Appellant Brief was served by First-Class Mail on the 14th day of September, 2015, to the following address:

Catherine Luft
Assistant Criminal District Attorney
1450 East McKinney
Denton, TX 76209

_____
Seth Kretzer

NO. 02-15-00113-CR

---

COURT OF APPEALS
FOR THE SECOND DISTRICT OF TEXAS

---

ZACHARY R. ROBINSON

V.

STATE OF TEXAS

---

ON APPEAL FROM COUNTY CRIMINAL COURT NO. 1, DENTON
COUNTY, TEXAS
THE HONORABLE JIM E. CROUCH PRESIDING

---

APPENDIX TO BRIEF OF APPELLANT

---

**SUBMITTED BY:**

**Seth Kretzer**
**Law Offices of Seth Kretzer**
**440 Louisiana Street; Suite 200**
**Houston, TX 77002**
**Bar Number: 24043764**

# TABLE OF CONTENTS

**Tab**

Judgment of Community Supervision…………………………………………………A

Texas Penal Code §1.07……………………………………………………………….B

Texas Penal Code § 22.01…………………………………………………………..C

Texas Penal Code § 42.062……………………………………………………D

# APPENDIX TO BRIEF OF APPELLANT

# TAB A

CR- 2014-07472-A

THE STATE OF TEXAS

§
§
§
§
§

VS.

Zachary R. Robinson

IN THE ~~COUNTY~~ DEPUTY

CRIMINAL COURT NO. 1

DENTON COUNTY, TEXAS

## JUDGMENT OF COMMUNITY SUPERVISION

(JURY TRIAL)

On the _____ day of _____, 20____, the above case was called, the State appeared through her Assistant District Attorney _Emily Tanner / Spencer Robuck_____, and the Defendant appeared with counsel _Nicole Knox_____, the Defendant entered a plea of NOT GUILTY to the Information herein, and upon submission of evidence to the Jury they returned a verdict of **guilty** to the misdemeanor offense of _Interference with Emergency Call_____ as charged in the Information, committed on the __8th___ day of __September___, _2014_. The Court adjudged the Defendant guilty and the Defendant's punishment was assessed by the jury/court at confinement in the Denton County Jail for a period of __180___ days with a fine in the amount of $_____0____. The jury/court finds that the ends of justice and best interest of the public and the Defendant will be served by suspending the imposition of the jail sentence and placing the Defendant on Community Supervision. ~~The Court makes an affirmative finding that the defendant and victim are family members or members of the same household.~~

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that imposition of the jail sentence be suspended and the Defendant is hereby placed on Community Supervision for a period of _____15_____ months subject to the following terms and conditions.

**THE COURT ORDERS** that the Defendant shall:

(A)     Commit no offense against the laws of this State, of any other State, or the United States, and avoid the illegal use or possession of controlled substances and/or marijuana;

(B)     Avoid persons or places of disreputable or harmful character;

(C)     Report to the Community Supervision and Corrections Department of Denton County, Texas, immediately following this hearing, and no less than monthly thereafter, or as scheduled by the court or supervision officer and obey all rules and regulations of the department;

(D)     Pay to the Community Supervision and Corrections Department, P.O. Box 1309, Denton, Texas 76202, a supervision fee in the amount of $_50.00__ on or before the 20th day of ___May_, 20_15_ and pay that amount on or before the 20th day of each month thereafter during the period of Community Supervision.

(E)     Permit the Supervision Officer to visit you at your residence or elsewhere, and notify your supervision officer of any change of address or employment prior to such move;

(F)     Work faithfully at suitable employment as far as possible and support your dependants;

(G)     Remain within the State of Texas during the term of Community Supervision unless given permission to leave the State in writing by the Court;

(H)     Pay a fine in the amount of $_____0_____ together with court costs of $_259.00__ and fees to the Denton County Clerk ~~INSTANTER~~; however, if applying for a payment plan, you are Ordered to immediately report to the Denton County Collections Compliance Department located in the Courts Building at 1450 E. McKinney, Ste 1400 and make payments in accordance with the terms and conditions agreed upon.

(I)     Complete __80___ hours of Community Service Restitution at a community service project or projects for an organization or organizations listed in the addendum marked "Exhibit A" to this condition and attached to this order, to be completed at a rate of not less than four hours per week starting by, but not later than, 60 days from the effective date of this order, and provide your supervision officer with written verification of hours worked monthly;

(J)     Submit to testing for alcohol or illicit drug usage at the request of the Supervision Officer and pay for the costs of these tests within 30 days of giving the specimen.

_____ ✓ (4)   Consume no alcoholic beverages during the term of Community Supervision;

_____ (5)   Successfully complete, within 181 days, a DWI Safety Education Program / the Drug Offender Education Program/DWI Repeat Offender Program, through an agency approved by your Supervision Officer, pay all required fees for the program, and provide written proof of the completion of the program to the Denton County Community Supervision and Corrections Department within 10 days of the date of completion;

_____ (6)   Attend AA/NA _____ times weekly and provide written proof of attendance to your Supervision Officer at each monthly report beginning the first week after this order;

_____ (7)   Do not operate a motor vehicle for a period of _____ months unless the vehicle is equipped with a device that uses a deep-lung analysis mechanism to make impractical the operation of the motor vehicle if ethyl alcohol is detected in the breath of the operator. Have the device installed on or before _____ , follow recalibration schedules and rules of the monitoring agency and pay all costs incurred;

_____ (8)   Participate in the Life Skills Program/ Anger Management Program; Alcohol Seller/Server Program; begin participation in the program(s) within 60 days of this order at an approved agency, comply with the rules of the agency, and pay all costs of the services. Continue in said treatment until successfully completed as stated by the counselor with the agreement of his community supervision officer. Provide written proof of completion to the Supervision Officer within 270 days of this order.

_____ ✓ (9)   Participate and complete the Batterer's Intervention Program; begin Orientation within 60 days; start the weekly group sessions within 90 days of this order at an approved agency, comply with the rules of the agency, and pay all costs of the services. Continue in said treatment until successfully completed as stated by the counselor with the agreement of his community supervision officer. Provide written proof of completion to the Supervision Officer within 360 days.

_____ (10)   Within 10 days submit to an evaluation for sexual deviancy through an agency approved by your Supervision Officer and provide written proof of completion to your Supervision Officer within 30 days; if treatment is deemed necessary, attend, participate and comply with the rules of the agency, and pay all costs incurred; continue in treatment until successfully completed as determined by your Supervision Officer;

_____ (11)   Enroll in an "English As A Second Language (ESL)" class within thirty (30) days of date of this judgment, and successfully complete and provide proof of completion to your community supervision officer no later than thirty (30) days prior to the expiration of the probationary period;

_____ ✓ (12)   Pay $_10_ to the Denton County Crime Stoppers Program through the Denton County Community Supervision and Corrections Department within 30 days;

_____ ✓ (13)   Successfully complete within 181 days of this order the ~~Youthful Drinking and Driving Prevention Program/ DWI Victim Impact Panel/~~ Domestic Violence Victim Impact Panel and pay all costs of such panel; provide written proof of completion to your Supervision Officer within 10 days of the date of completion;

_____ (14)   Maintain proof of financial responsibility for any motor vehicle you own or operate, and provide proof to your Supervision Officer each time you report and at any other time it is requested;

_____ ✓ (15)   Possess no firearms;

_____ (16)   Pay $_____ to a Family Violence Center in Denton County that receives state or federal funds; to be paid through the Denton County Community Supervision and Corrections Department in installments of $_____ per month, beginning on or before the _____ day of _____, _____, and a like payment on the same day of each month thereafter until fully paid;

_____ ✓ (17)   No contact with Rachel Kimberling except as it rela[tes] to the mortgage of the current home on Yorkshire, Flower Moun[d]

You are hereby advised that under the law of this State, the Court shall determine the terms and conditions of your Community Supervision. The Court also has the authority at any time during the period of Community Supervision to revoke your Community Supervision, or to proceed to adjudication for violation of any of the conditions of your Community Supervision set out above.

DONE AND ENTERED this the __1__ day of ____April____, 20_15_.

_____
JUDGE PRESIDING

# Exhibit A

Abundant Children's Home
Advocacy & Pregnancy Center
AIDS Services
All Texas Family Rescue
American Legion Senior Center
Animal Guardians Of America
Ann's Haven, VNA
ARC Of Denton County, The
Argyle Food Bank
Aubrey Church of Christ
Boy Scouts - Longhorn Council
Boys & Girls Clubs Of Denton County
Briarwood Retreat Center
Children's Advocacy Center
Christian Community Action
City Of Argyle
City Of Coppell
City Of Denton - Fleet Maintenance
City Of Denton - Parks And Recreation
City Of Flower Mound
City Of Hickory Creek
City Of Roanoke
City Of Sanger Library
City Of The Colony -Parks/Rec Only
Communities In Schools In North Texas
Community Education L.I.S.D.
Court Appointed Special Advocates
Covenant Fellowship Church
Day Stay for Adults
Denton Affordable Housing
Denton Black Chamber of Commerce
Denton Commercial Solid Waste
Denton Community Food Center
Denton Community Theatre
Denton County Friends Of The Family
Denton County M.H.M.R.
Denton County Operations
Denton County Records Management
Denton County Veteran's Services
Denton Housing Authority
Denton Kiwani's Children's Clinic

Denton Public Library    Emily Fowler Branch
Denton Public Library    North Branch
Denton Public Library    South Branch
Denton Senior Center
Fairhaven Retirement Home
Fairoaks Retirement Apartment
Family Health Care
Family Resource Center Of North Texas
Flower Mound Y.M.C.A.
Fred Moore Day Nursery School
Freedom Row Hopes Tomorrow
Frisco Family Y.M.C.A.
Frisco Project For The Future
Frisco Public Works
Goodwill Industries, Inc.
Habitat For Humanity
Human Resources (Aging & Medicaid)
Integrity Park
Interfaith Ministries Of North Texas
Keep Denton Beautiful
Keep Lewisville Beautiful
Krum Public Library
Lake Dallas Community Service Program
Legal Aid Of North West Texas
Lewisville Aquatic Center
Lewisville Environmental Learning Area
Lewisville Lake Environ. Learning Area
Lewisville Parks And Leisure Services
Lewisville Public Library
Lewisville Senior Activity Center
Martin Luther King, Jr. Recreation Center
Meals On Wheels (SPAN)
Metrocrest Social Services Center
Metroport Meals On Wheel - Roanoke
Mothers Against Drunk Drivers - Denton
Mothers Against Drunk Drivers - Lewisville
North Lakes Recreation Center
Northwest Christian Services

Operation Kindness - Anima Shelter
Pecan Creek Reclamation Pl
PediPlace
Phillip's Wish
Pilot Point Community Oper House
Project Access
Ranch Hand Rescue
Reading & Radio Resource
Reata Rehabilitation
Retired & Senior Volunteer Program
Riding Unlimited
Roanoke Parks Department
Ruth's Room
S.P.C.A. Of Texas - The Colo
Salvation Army Of Denton
Saturday Morning Work Crew
Save The Animals Rescue S
Services Program For Aging Needs
St. Vincent DePaul Society
Stable Strides Farm
Stewart Creek Park
T.R.U.S.A.R. (Texas Respon Unit)
Tactical Enforcement K-9's
Tersa's Resale Shop
Texas Cares
Texas Department Of Huma Services
Texas National Guard
Texas Parks & Wildlife (Lak Roberts)
Texas Workforce
Transformations
Visions Ministries

# APPENDIX TO BRIEF OF APPELLANT

## TAB B

PENAL CODE

TITLE 1. INTRODUCTORY PROVISIONS

CHAPTER 1. GENERAL PROVISIONS


Sec. 1.07.  DEFINITIONS.  (a)  In this code:
(1)  "Act" means a bodily movement, whether voluntary or involuntary, and includes speech.
(2)  "Actor" means a person whose criminal responsibility is in issue in a criminal action. Whenever the term "suspect" is used in this code, it means "actor."
(3)  "Agency" includes authority, board, bureau, commission, committee, council, department, district, division, and office.
(4)  "Alcoholic beverage" has the meaning assigned by Section 1.04, Alcoholic Beverage Code.
(5)  "Another" means a person other than the actor.
(6)  "Association" means a government or governmental subdivision or agency, trust, partnership, or two or more persons having a joint or common economic interest.
(7)  "Benefit" means anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested.
(8)  "Bodily injury" means physical pain, illness, or any impairment of physical condition.
(9)  "Coercion" means a threat, however communicated:

(A)  to commit an offense;

(B)  to inflict bodily injury in the future on the person threatened or another;

(C)  to accuse a person of any offense;

(D)  to expose a person to hatred, contempt, or ridicule;

(E)  to harm the credit or business repute of any person;  or

(F)  to take or withhold action as a public servant, or to cause a public servant to take or withhold action.

(10)  "Conduct" means an act or omission and its accompanying mental state.

(11)  "Consent" means assent in fact, whether express or apparent.

(12)  "Controlled substance" has the meaning assigned by Section 481.002, Health and Safety Code.

(13)  "Corporation" includes nonprofit corporations, professional associations created pursuant to statute, and joint stock companies.

(14)  "Correctional facility" means a place designated by law for the confinement of a person arrested for, charged with, or convicted of a criminal offense.  The term includes:

(A)  a municipal or county jail;

(B)  a confinement facility operated by the Texas Department of Criminal Justice;

(C)  a confinement facility operated under contract with any division of the Texas Department of Criminal Justice;  and

(D)  a community corrections facility operated by a community supervision and corrections department.

(15)  "Criminal negligence" is defined in

Section 6.03 (Culpable Mental States).
(16)  "Dangerous drug" has the meaning assigned by Section 483.001, Health and Safety Code.
(17)  "Deadly weapon" means:
(A)  a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury;  or
(B)  anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.
(18)  "Drug" has the meaning assigned by Section 481.002, Health and Safety Code.
(19)  "Effective consent" includes consent by a person legally authorized to act for the owner. Consent is not effective if:
(A)  induced by force, threat, or fraud;
(B)  given by a person the actor knows is not legally authorized to act for the owner;
(C)  given by a person who by reason of youth, mental disease or defect, or intoxication is known by the actor to be unable to make reasonable decisions;  or
(D)  given solely to detect the commission of an offense.
(20)  "Electric generating plant" means a facility that generates electric energy for distribution to the public.
(21)  "Electric utility substation" means a facility used to switch or change voltage in connection with the transmission of electric energy for distribution to the public.
(22)  "Element of offense" means:
(A)  the forbidden conduct;
(B)  the required culpability;
(C)  any required result;  and

(D)  the negation of any exception to the offense.

(23)  "Felony" means an offense so designated by law or punishable by death or confinement in a penitentiary.

(24)  "Government" means:

(A)  the state;

(B)  a county, municipality, or political subdivision of the state;  or

(C)  any branch or agency of the state, a county, municipality, or political subdivision.

(25)  "Harm" means anything reasonably regarded as loss, disadvantage, or injury, including harm to another person in whose welfare the person affected is interested.

(26)  "Individual" means a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth.

(27)  Repealed by Acts 2009, 81st Leg., R.S., Ch. 87, Sec. 25.144, eff. September 1, 2009.

(28)  "Intentional" is defined in Section 6.03 (Culpable Mental States).

(29)  "Knowing" is defined in Section 6.03 (Culpable Mental States).

(30)  "Law" means the constitution or a statute of this state or of the United States, a written opinion of a court of record, a municipal ordinance, an order of a county commissioners court, or a rule authorized by and lawfully adopted under a statute.

(31)  "Misdemeanor" means an offense so designated by law or punishable by fine, by confinement in jail, or by both fine and confinement in jail.

(32)  "Oath" includes affirmation.

(33)  "Official proceeding" means any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant.

(34)  "Omission" means failure to act.

(35)  "Owner" means a person who:

(A)  has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor;  or

(B)  is a holder in due course of a negotiable instrument.

(36)  "Peace officer" means a person elected, employed, or appointed as a peace officer under Article 2.12, Code of Criminal Procedure, Section 51.212 or 51.214, Education Code, or other law.

(37)  "Penal institution" means a place designated by law for confinement of persons arrested for, charged with, or convicted of an offense.

(38)  "Person" means an individual, corporation, or association.

(39)  "Possession" means actual care, custody, control, or management.

(40)  "Public place" means any place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, apartment houses, office buildings, transport facilities, and shops.

(41)  "Public servant" means a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if he has not yet qualified for office or assumed his

duties:
(A)  an officer, employee, or agent of government;
(B)  a juror or grand juror;  or
(C)  an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy;  or
(D)  an attorney at law or notary public when participating in the performance of a governmental function;  or
(E)  a candidate for nomination or election to public office;  or
(F)  a person who is performing a governmental function under a claim of right although he is not legally qualified to do so.
(42)  "Reasonable belief" means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor.
(43)  "Reckless" is defined in Section 6.03 (Culpable Mental States).
(44)  "Rule" includes regulation.
(45)  "Secure correctional facility" means:
(A)  a municipal or county jail;  or
(B)  a confinement facility operated by or under a contract with any division of the Texas Department of Criminal Justice.
(46)  "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.
(46-a)  "Sight order" means a written or electronic instruction to pay money that is authorized by the person giving the instruction

and that is payable on demand or at a definite time by the person being instructed to pay. The term includes a check, an electronic debit, or an automatic bank draft.

(46-b)  "Federal special investigator" means a person described by Article 2.122, Code of Criminal Procedure.

(47)  "Swear" includes affirm.

(48)  "Unlawful" means criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege.

(49)  "Death" includes, for an individual who is an unborn child, the failure to be born alive.

(b)  The definition of a term in this code applies to each grammatical variation of the term.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1975, 64th Leg., p. 912, ch. 342, Sec. 1, eff. Sept. 1, 1975;  Acts 1977, 65th Leg., p. 2123, ch. 848, Sec. 1, eff. Aug. 29, 1977;  Acts 1979, 66th Leg., p. 1113, ch. 530, Sec. 1, eff. Aug. 27, 1979;  Acts 1979, 66th Leg., p. 1520, ch. 655, Sec. 1, eff. Sept. 1, 1979;  Acts 1987, 70th Leg., ch. 167, Sec. 5.01(a)(43), eff. Sept. 1, 1987;  Acts 1989, 71st Leg., ch. 997, Sec. 1, eff. Aug. 28, 1989;  Acts 1991, 72nd Leg., ch. 543, Sec. 1, eff. Sept. 1, 1991;  Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994;  Acts 2003, 78th Leg., ch. 822, Sec. 2.01, eff. Sept. 1, 2003.

Amended by:

Acts 2009, 81st Leg., R.S., Ch. 87 (S.B. 1969), Sec. 25.144, eff. September 1, 2009.

Acts 2009, 81st Leg., R.S., Ch. 421 (H.B. 2031), Sec. 1, eff. September 1, 2009.
Acts 2011, 82nd Leg., R.S., Ch. 839 (H.B. 3423), Sec. 1, eff. September 1, 2011.

# APPENDIX TO BRIEF OF APPELLANT

## TAB C

PENAL CODE

TITLE 5. OFFENSES AGAINST THE PERSON

CHAPTER 22. ASSAULTIVE OFFENSES


Sec. 22.01.  ASSAULT.  (a)  A person commits an offense if the person:
(1)  intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse;
(2)  intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse;  or
(3)  intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.
(b)  An offense under Subsection (a)(1) is a Class A misdemeanor, except that the offense is a felony of the third degree if the offense is committed against:
(1)  a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant;
(2)  a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code, if:
(A)  it is shown on the trial of the offense that the defendant has been previously convicted

of an offense under this chapter, Chapter 19, or Section 20.03, 20.04, 21.11, or 25.11 against a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code; or

(B)  the offense is committed by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth;

(3)  a person who contracts with government to perform a service in a facility as defined by Section 1.07(a)(14), Penal Code, or Section 51.02(13) or (14), Family Code, or an employee of that person:

(A)  while the person or employee is engaged in performing a service within the scope of the contract, if the actor knows the person or employee is authorized by government to provide the service;  or

(B)  in retaliation for or on account of the person's or employee's performance of a service within the scope of the contract;

(4)  a person the actor knows is a security officer while the officer is performing a duty as a security officer; or

(5)  a person the actor knows is emergency services personnel while the person is providing emergency services.

(b-1)  Notwithstanding Subsection (b)(2), an offense under Subsection (a)(1) is a felony of the second degree if:

(1)  the offense is committed against a person whose relationship to or association with the

defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code;

(2)  it is shown on the trial of the offense that the defendant has been previously convicted of an offense under this chapter, Chapter 19, or Section 20.03, 20.04, or 21.11 against a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code; and

(3)  the offense is committed by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth.

(c)  An offense under Subsection (a)(2) or (3) is a Class C misdemeanor, except that the offense is:

(1)  a Class A misdemeanor if the offense is committed under Subsection (a)(3) against an elderly individual or disabled individual, as those terms are defined by Section 22.04;  or

(2)  a Class B misdemeanor if the offense is committed by a person who is not a sports participant against a person the actor knows is a sports participant either:

(A)  while the participant is performing duties or responsibilities in the participant's capacity as a sports participant;  or

(B)  in retaliation for or on account of the participant's performance of a duty or responsibility within the participant's capacity as a sports participant.

(d)  For purposes of Subsection (b), the actor is presumed to have known the person assaulted

was a public servant, a security officer, or emergency services personnel if the person was wearing a distinctive uniform or badge indicating the person's employment as a public servant or status as a security officer or emergency services personnel.

(e)  In this section:

(1)  "Emergency services personnel" includes firefighters, emergency medical services personnel as defined by Section 773.003, Health and Safety Code, emergency room  personnel, and other individuals who, in the course and scope of employment or as a volunteer, provide services for the benefit of the general public during emergency situations.

(3)  "Security officer" means a commissioned security officer as defined by Section 1702.002, Occupations Code, or a noncommissioned security officer registered under Section 1702.221, Occupations Code.

(4)  "Sports participant" means a person who participates in any official capacity with respect to an interscholastic, intercollegiate, or other organized amateur or professional athletic competition and includes an athlete, referee, umpire, linesman, coach, instructor, administrator, or staff member.

(f)  For the purposes of Subsections (b)(2)(A) and (b-1)(2):

(1)  a defendant has been previously convicted of an offense listed in those subsections committed against a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code, if the defendant was adjudged guilty of

the offense or entered a plea of guilty or nolo contendere in return for a grant of deferred adjudication, regardless of whether the sentence for the offense was ever imposed or whether the sentence was probated and the defendant was subsequently discharged from community supervision; and

(2) a conviction under the laws of another state for an offense containing elements that are substantially similar to the elements of an offense listed in those subsections is a conviction of the offense listed.

(g) If conduct constituting an offense under this section also constitutes an offense under another section of this code, the actor may be prosecuted under either section or both sections.

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.  Amended by Acts 1977, 65th Leg., 1st C.S., p. 55, ch. 2, Sec. 12, 13, eff. July 22, 1977;  Acts 1979, 66th Leg., p. 260, ch. 135, Sec. 1, 2, eff. Aug. 27, 1979;  Acts 1979, 66th Leg., p. 367, ch. 164, Sec. 2, eff. Sept. 1, 1979;  Acts 1983, 68th Leg., p. 5311, ch. 977, Sec. 1, eff. Sept. 1, 1983;  Acts 1987, 70th Leg., ch. 1052, Sec. 2.08, eff. Sept. 1, 1987;  Acts 1989, 71st Leg., ch. 739, Sec. 1 to 3, eff. Sept. 1, 1989;  Acts 1991, 72nd Leg., ch. 14, Sec. 284(23) to (26), eff. Sept. 1, 1991;  Acts 1991, 72nd Leg., ch. 334, Sec. 1, eff. Sept. 1, 1991;  Acts 1991, 72nd Leg., ch. 366, Sec. 1, eff. Sept. 1, 1991;  Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994; Acts 1997, 75th Leg., ch. 165, Sec. 27.01, eff. Sept. 1, 1997;  Acts 1995, 74th Leg., ch.

318, Sec. 5, eff. Sept. 1, 1995;  Acts 1995, 74th Leg., ch. 659, Sec. 1, eff. Sept. 1, 1995; Acts 1997, 75th Leg., ch. 165, Sec. 27.01, 31.01(68), eff. Sept. 1, 1997;  Acts 1999, 76th Leg., ch. 62, Sec. 15.02(a), eff. Sept. 1, 1999; Acts 1999, 76th Leg., ch. 1158, Sec. 1, eff. Sept. 1, 1999;  Acts 2003, 78th Leg., ch. 294, Sec. 1, eff. Sept. 1, 2003;  Acts 2003, 78th Leg., ch. 1019, Sec. 1, 2, eff. Sept. 1, 2003; Acts 2003, 78th Leg., ch. 1028, Sec. 1, eff. Sept. 1, 2003.

Amended by:

Acts 2005, 79th Leg., Ch. 728 (H.B. 2018), Sec. 16.002, eff. September 1, 2005.

Acts 2005, 79th Leg., Ch. 788 (S.B. 91), Sec. 1, eff. September 1, 2005.

Acts 2005, 79th Leg., Ch. 788 (S.B. 91), Sec. 2, eff. September 1, 2005.

Acts 2005, 79th Leg., Ch. 788 (S.B. 91), Sec. 6, eff. September 1, 2005.

Acts 2007, 80th Leg., R.S., Ch. 623 (H.B. 495), Sec. 1, eff. September 1, 2007.

Acts 2007, 80th Leg., R.S., Ch. 623 (H.B. 495), Sec. 2, eff. September 1, 2007.

Acts 2009, 81st Leg., R.S., Ch. 427 (H.B. 2066), Sec. 1, eff. September 1, 2009.

Acts 2009, 81st Leg., R.S., Ch. 665 (H.B. 2240), Sec. 2, eff. September 1, 2009.

Acts 2013, 83rd Leg., R.S., Ch. 875 (H.B. 705), Sec. 1, eff. September 1, 2013.

# APPENDIX TO BRIEF OF APPELLANT

## TAB D

PENAL CODE

TITLE 9. OFFENSES AGAINST PUBLIC ORDER AND
DECENCY

CHAPTER 42. DISORDERLY CONDUCT AND RELATED
OFFENSES

Sec. 42.062.  INTERFERENCE WITH EMERGENCY
REQUEST FOR ASSISTANCE.  (a)  An individual
commits an offense if the individual knowingly
prevents or interferes with another individual's
ability to place an emergency call or to request
assistance, including a request for assistance
using an electronic communications device, in an
emergency from a law enforcement agency, medical
facility, or other agency or entity the primary
purpose of which is to provide for the safety of
individuals.
(b)  An individual commits an offense if the
individual recklessly renders unusable an
electronic communications device, including a
telephone, that would otherwise be used by
another individual to place an emergency call or
to request assistance in an emergency from a law
enforcement agency, medical facility, or other
agency or entity the primary purpose of which is
to provide for the safety of individuals.
(c)  An offense under this section is a Class A
misdemeanor, except that the offense is a state
jail felony if the actor has previously been
convicted under this section.
(d)  In this section, "emergency" means a
condition or circumstance in which any
individual is or is reasonably believed by the
individual making a call or requesting

assistance to be in fear of imminent assault or in which property is or is reasonably believed by the individual making the call or requesting assistance to be in imminent danger of damage or destruction.

Added by Acts 2001, 77th Leg., ch. 690, Sec. 1, eff. Sept. 1, 2001.  Amended by Acts 2003, 78th Leg., ch. 460, Sec. 1, eff. Sept. 1, 2003;  Acts 2003, 78th Leg., ch. 1164, Sec. 1, eff. Sept. 1, 2003.

Amended by:

Acts 2013, 83rd Leg., R.S., Ch. 331 (H.B. 1972), Sec. 7, eff. September 1, 2013.

Acts 2013, 83rd Leg., R.S., Ch. 331 (H.B. 1972), Sec. 8, eff. September 1, 2013.